**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOSHUA MCCOLLUM, OAKFORD CRAWSON LLC, JEFFREY MAGOVENY, NG BOON MIN, LIM TECK YEOW, ALEXEJ KRAVETSKER, and MICHAEL MEDOVOJ on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CIRCLE INTERNET GROUP, INC., and CIRCLE INTERNET FINANCIAL, LLC,

Defendants.

Civil Action No. 1:26-cv-11733-WGY

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1
FACTUAL AND PROCEDURAL BACKGROUND ........ 3
I. CRYPTOCURRENCY AND BLOCKCHAIN TECHNOLOGY. ........ 3
II. CIRCLE LLC AND ITS COMMITMENT TO LEGAL COMPLIANCE. ........ 4
III. THE CROSS-CHAIN TRANSFER PROTOCOL. ........ 5
IV. THE NORTH KOREAN EXPLOIT OF DRIFT PROTOCOL. ........ 6
V. STATEMENT OF THE PLAINTIFFS AND CLAIMS. ........ 8
ARGUMENT ........ 9
I. THIS COURT LACKS PERSONAL JURISDICTION OVER CIGI. ........ 9
II. THE COMPLAINT STATES NO LEGALLY PLAUSIBLE CLAIMS. ........ 11
A. Plaintiffs do not plead any specific allegations to either CIGI or Circle LLC. ........ 11
B. Plaintiffs have not plausibly alleged aiding and abetting. ........ 11
1. The alleged facts do not constitute substantial assistance. ........ 12
2. Plaintiffs fail to allege a culpable mental state. ........ 16
C. Plaintiffs have not plausibly alleged negligence. ........ 17
1. Defendants did not owe Plaintiffs a duty of care. ........ 17
2. The economic-loss doctrine bars Plaintiffs' claims. ........ 20
CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Gissell*,
No. 20-CV-11366-PBS, 2021 WL 8316261 (D. Mass. Dec. 8, 2021) ....................................12

*Alianza Americas v. DeSantis*,
727 F. Supp. 3d 9 (D. Mass. 2024) ....................................10

*Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*,
447 Mass. 616 (2006) ....................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................11

*Bamberg v. SG Cowen*,
236 F. Supp. 2d 79 (D. Mass. 2002) ....................................12

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*,
825 F.3d 28 (1st Cir. 2016) ....................................9

*Bridge Street Auto., Inc. v. Green Valley Oil, LLC*,
985 F. Supp. 2d 96 (D. Mass. 2013) ....................................10

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*,
582 U.S. 255 (2017) ....................................9

*Cahaly v. Benistar Prop. Exch. Tr. Co.*,
451 Mass. 343 (2008) ....................................16

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
455 Mass. 458 (2009) ....................................20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ....................................10

*Eisenberg v. Wachovia Bank, N.A.*,
301 F.3d 220 (4th Cir. 2002) ....................................18

*Escude Cruz v. Ortho Pharm. Corp.*,
619 F.2d 902 (1st Cir. 1980) ....................................10

*Evans v. Lorillard Tobacco Co.*,
465 Mass. 411 (2013) ....................19

*Ferrante v. Santander Bank, N.A.*,
680 F. Supp. 3d 52 (D. Mass. 2023) ....................13

*FMR Corp. v. Bos. Edison Co.*,
415 Mass. 393 (1993) ....................20

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ....................9

*Garcia v. Santander Bank, N.A.*,
105 Mass. App. Ct. 1123 (2025) ....................18

*Gardner v. Cape Cod Healthcare, Inc.*,
344 F.R.D. 127 (D. Mass. 2023) ....................6

*Gemstone Foods, L.L.C. v. JPMorgan Chase Bank, N.A.*,
No. 26-60049, 2026 WL 1507876 (5th Cir. May 29, 2026) ....................19

*Giragosian v. Ryan*,
547 F.3d 59 (1st Cir. 2008) ....................4

*Go-Best Assets Ltd. v. Citizens Bank of Mass.*,
463 Mass. 50 (2012) .................... passim

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ....................10

*Haley v. City of Boston*,
657 F.3d 39 (1st Cir. 2011) ....................4

*Henderson v. Bank of New York Mellon Corp.*,
146 F. Supp. 3d 438 (D. Mass. 2015) ....................11

*Hollis v. JPMorgan Chase Bank, N.A.*,
No. 12-10544-JGD, 2014 WL 12792255 (D. Mass. Dec. 10, 2014) .................... passim

*In re LastPass Data Sec. Incident Litig.*,
742 F. Supp. 3d 109 (D. Mass. 2024) ....................20

*In re State St. Cases*,
No. 12-CV-11770-NMG, 2013 WL 5508151 (D. Mass. Aug. 21, 2013) ....................15

*Islam v. Option One Mortg. Corp.*,
432 F. Supp. 2d 181 (D. Mass. 2006) ........................................................................13

*Kendall v. Schedin*,
No. 09-CV-40163-TSH, 2011 WL 2693914 (D. Mass. July 8, 2011)....................................19

*Mansor v. JPMorgan Chase Bank, N.A.*,
183 F. Supp. 3d 250 (D. Mass. 2016) ..........................................................12, 13, 18

*Maruho Co. v. Miles, Inc.*,
13 F.3d 6 (1st Cir. 1993)..................................................................................12, 16

*Mass. Port Auth. v. Turo Inc.*,
487 Mass. 235 (2021) .............................................................................11, 12, 15

*McCallum v. Rizzo*,
No. 942878, 1995 WL 1146812 (Mass. Super. Oct. 13, 1995) ..............................................18

*Planned Parenthood League of Mass., Inc. v. Blake*,
417 Mass. 467 (1994) ......................................................................................16, 17

*Rosenberg v. Mass. Mut. Life Ins. Co.*,
No. 23-CV-10441-FDS, 2024 WL 421780 (D. Mass. Feb. 5, 2024)......................................12

*Rush v. Savchuk*,
444 U.S. 320 (1980)...............................................................................................10

*Sanchez v. Pereira-Castillo*,
590 F.3d 31 (1st Cir. 2009).........................................................................................11

*Taylor v. Am. Chemistry Council*,
576 F.3d 16 (1st Cir. 2009)..............................................................................12, 16, 17

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)....................................................................................12, 15, 17

*Wood v. Bank of Am., N.A.*,
No. 24-CV-11430-DJC, 2025 WL 894650 (D. Mass. Mar. 24, 2025) ...................................14

**STATUTES**

12 U.S.C. § 5903(a)(6)(B) .......................................................................................5

31 U.S.C. § 5312(a)(2).............................................................................................19

Mass. Gen. Laws Chapter 223A § 3(a) ........................................................................................9

## INTRODUCTION

Plaintiffs allege that they and others lost an estimated $285 million in unidentified cryptocurrencies when groups linked to North Korea exploited a cryptocurrency trading platform called Drift Protocol. Rather than sue either the alleged thieves or the trading platform that permitted the exploit, Plaintiffs seek to recover their losses from two innocent companies with no connection to the wrongdoers—Circle Internet Group, Inc. (CIGI) and Circle Internet Financial, LLC (Circle LLC).

Plaintiffs allege no affirmative acts by Defendants to facilitate the alleged crime. Nor do Plaintiffs claim that they were customers of Defendants, that Defendants held custody of the stolen assets, or that Defendants had any relationship with the alleged thieves or Drift Protocol. The slender reed on which Plaintiffs' claims rest is that Defendants allegedly took no affirmative steps in the hours immediately following the theft to freeze transfers of the USDC stablecoin in the hackers' wallets or block the wrongdoers from using Cross-Chain Transfer Protocol (CCTP), a permissionless software program used to bridge USDC from one blockchain to another.

Plaintiffs' claims lack any valid legal basis. To start, Plaintiffs do not plausibly allege facts showing that the Court can exercise personal jurisdiction over CIGI, a Delaware company with its principal place of business in New York. Plaintiffs do not allege that CIGI had any relevant contacts with Massachusetts as required to establish specific jurisdiction. Nor do Plaintiffs allege that CIGI had "continuous and systematic" ties to the forum sufficient to satisfy the demands of general jurisdiction. Thus, CIGI should be dismissed under Rule 12(b)(2).

Also, the Complaint as a whole fails to state any claim against both Defendants and must be dismissed under Rule 12(b)(6). Plaintiffs make no specific allegations of conduct by either Defendant, instead consistently conflating the two as "Circle." But Defendants are not liable for

each other's actions absent allegations of alter ego or vicarious liability, which are absent from the Complaint.

For their aiding-and-abetting claim, Plaintiffs do not plausibly allege that Defendants substantially assisted the hackers' theft or intended to assist them in their scheme. Instead, the Complaint faults Defendants solely for their *inaction*—i.e., that Defendants did not block the hackers' transactions during the eight-hour heist—which is insufficient as a matter of law to plead aiding and abetting. Nor do Plaintiffs plausibly allege that Defendants had actual knowledge that this inaction was substantially assisting the hackers—relying instead on social media posts—let alone that Defendants intended to facilitate the theft.

Plaintiffs' negligence claim also falls flat. For that claim, Plaintiffs allege that Defendants owed them a duty of care to protect them from third-party hackers. But Massachusetts law imposes no such duty. Plaintiffs do not allege that they are customers of Defendants. And Massachusetts law assigns no obligation to Defendants to prevent non-customers from being injured by third parties. Moreover, Plaintiffs' negligence claim is barred by the economic-loss doctrine because it arises from a purely economic harm—i.e., damages from the loss of their stolen crypto assets.

It is no cure to these deficiencies for Plaintiffs to emphasize that Defendants had the technological ability to block the hackers' transfers of USDC during their post-theft digital "getaway." Circle LLC's publicly available policy, which aligns with federal law governing stablecoin issuers, is to use that ability only upon receipt either of a valid court order or official governmental process—*not* in response to suspicion, unverified social media posts, or requests from non-government actors. Circle LLC takes its legal obligations seriously. And precisely for that reason, Circle LLC believes that its policy requiring judicial review (or at least disinterested governmental involvement) best aligns with the rule of law and avoids the risk that misguided

private action will harm innocent third parties. That commonsense policy is completely consistent with Massachusetts law.

For those reasons, and because the legal deficiencies in Plaintiffs' claims cannot be cured, the Court should dismiss the Complaint with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I. CRYPTOCURRENCY AND BLOCKCHAIN TECHNOLOGY.

Cryptocurrency is a digital asset created, transferred, and stored using blockchain technology. Amended Complaint, ECF No. 4 ("Complaint" or "Compl.") ¶ 22. Individual cryptocurrencies are called tokens. *Id.* These tokens exist within, and may be transferred between, digital wallets that have unique digital addresses, each resembling a serial number. *Id.* Blockchain technology relies on digital ledgers to record transactions. *Id.* ¶ 23. No central authority maintains these ledgers; instead, the transactions on a particular blockchain are verified, recorded, and maintained by a decentralized and distributed network of computers around the globe that are not controlled by a single person or entity. *Id.*

Just as there are multiple cryptocurrencies, there are multiple blockchains (i.e., the digital ledgers recording the transactions). Blockchain software developers have created tools that permit the transfer of tokens from one blockchain to another by "locking, transferring, minting, or otherwise representing assets across networks." *Id.* ¶ 28. One of these tools is called a burn-and-mint bridge. For a cryptocurrency to transfer across blockchains under this process, the token must first be burned (or destroyed) on the original, source blockchain before it is minted (or created) as a new token on the second, destination blockchain.

[1] This factual background is drawn from the Amended Complaint and the documents incorporated in it by reference. Defendants accept Plaintiffs' allegations as true at this stage, except where contradicted by such documents, and reserve the right to challenge them in the future.

## II. CIRCLE LLC AND ITS COMMITMENT TO LEGAL COMPLIANCE.

One type of cryptocurrency is called a stablecoin. *Id.* ¶ 24. The value of each stablecoin is tied to another asset, such as the U.S. dollar. *Id.* Circle LLC, a financial technology firm founded and based in Boston, Massachusetts, is the issuer of the USDC stablecoin. *Id.* ¶¶ 18, 29-30. USDC is designed to maintain a 1:1 price ratio to the U.S. dollar. *See id*. ¶ 24. To do so, Circle LLC maintains a reserve of highly liquid cash and cash-equivalent assets equal to all USDC in circulation. *See id.* Currently, there are approximately 75 billion USDC in circulation.[2]

USDC is a regulated financial instrument, issued under the laws of the United States, the European Union, and other countries around the globe. In the United States, Circle LLC is registered as a money services business with the U.S. Department of Treasury, and it holds money transmitter licenses in all 46 states that require them.[3] As part of its commitment to legal compliance, Circle LLC has the ability to block the transfer of USDC to and from specific wallets. *Id.* ¶ 35.

Circle LLC identifies three scenarios in which it will block wallets under a written policy that is publicly disclosed and incorporated by reference into the Complaint: (1) where "failure to grant a denial of access request presents a threat to the security, integrity, or reliability of the Circle Stablecoin network;" (2) "to comply with a law, regulation, or legal order from a duly recognized" governmental authority or court with jurisdiction over Circle LLC or its relevant affiliates; and (3) in connection with "certain urgent law enforcement requests pending a court order," government

---

[2] Circle, *USDC*, https://www.circle.com/usdc. The Complaint cites several webpages for the purpose of explaining the technologies at issue in this case. This Court may consider those webpages for that purpose. *See Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (courts may consider "facts and documents that are part of or incorporated into the complaint").

[3] Circle, *About Circle*, https://www.circle.com/about-circle (incorporated at Compl. ¶ 29 n.1). This Court may further take judicial notice of these licenses because they are "matters of public record." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

requests regarding "sanctions" or "imminent national security threats," or certain court orders regarding "diplomatic process."[4]

Circle LLC's approach is thus to take actions "such as freezing a wallet at the direction of law enforcement or the courts," rather than unilaterally blocking third parties who are not Circle customers based only on suspicion or unofficial sources.[5] This policy aligns with the GENIUS Act, which was enacted in 2025 to regulate stablecoin issuers. *See* 12 U.S.C. § 5903(a)(6)(B).

## III. THE CROSS-CHAIN TRANSFER PROTOCOL.

Circle LLC mints USDC on multiple blockchains. Compl. ¶ 43. An affiliate of Circle LLC—non-defendant Circle Technology Services, LLC (CTS LLC)—released the Cross-Chain Transfer Protocol, which is an automated burn-and-mint bridge that allows for the transfer of USDC across those different blockchains. *See id.* ¶ 31.[6] CCTP is a "permissionless" software resource, which means third-party companies and software developers may access, build on, and integrate it into their products for no charge and without authorization from any Circle entity.[7] In this way, it is a free resource available for third parties to use and integrate into their own products.

Once a third-party developer integrates CCTP into its application, end users of that application can use the product to transfer USDC between blockchains, often without even knowing they are accessing CCTP. And when an end user transfers USDC between blockchains through a developer's application, the process of both burning USDC on the source chain and

---

[4] *See* Circle Stablecoin Access Denial Policy §§ 2–3, https://tinyurl.com/yb2usyev (incorporated at Compl. ¶ 64). The policy was updated in May 2026 to include the third category.

[5] *See* D. Park, *Circle CEO Allaire defends decision not to freeze USDC in Drift exploit, citing 'moral quandary'*, The Block, https://tinyurl.com/mutuc86k (incorporated at Compl. ¶ 64 n.20).

[6] *See* Circle, *Cross-Chain Transfer Protocol*, https://developers.circle.com/cctp (incorporated at Compl. ¶ 32 n.4).

[7] *See id.* (describing CCTP as a "permissionless onchain utility" that can be used "to build applications that require moving USDC across blockchains").

minting it on the destination chain occurs without manual input, through a suite of smart contracts—computer programs stored within blockchains—that execute the burning and minting functions once predefined conditions are met.[8]

CCTP functions in part by providing a programmatic attestation when USDC is burned on the source blockchain. These attestations occur within seconds on the Solana blockchain—the blockchain allegedly at issue here—and are not discretionary.[9] Plaintiffs do not allege that any employee of Defendants made any decision about the attestations of the relevant transactions. Nor could they because once transactions are initiated, CCTP functions automatically. More broadly, Plaintiffs do not allege that Defendants have the ability to reverse, cancel, or recall any existing transaction involving CCTP—or that they took any affirmative action to approve the transactions at issue here. Instead, Plaintiffs fault Defendants for not blocking individual wallet addresses from using CCTP. *See id.* ¶ 35.[10]

## IV. THE NORTH KOREAN EXPLOIT OF DRIFT PROTOCOL.

Drift Protocol is a decentralized exchange built on the Solana blockchain where users trade digital assets and enter leveraged perpetual futures contracts tied to digital assets. *See* Compl. ¶¶ 40-42. For example, Drift Protocol allows its users to place speculative "bets [on] whether the

---

[8] *See id.*; *see also* Cross-*Chain Transfer Protocol FAQs*, https://www.circle.com/cross-chain-transfer-protocol. The Court may take judicial notice of these FAQs, which are publicly available on Circle's corporate website. *See Gardner v. Cape Cod Healthcare, Inc.*, 344 F.R.D. 127, 131 n.7 (D. Mass. 2023) ("corporate websites . . . are among the most commonly relied upon sources" for judicial notice) (citation omitted); *see also supra* 2.

[9] *See* Circle, *Cross-Chain Transfer Protocol*, https://developers.circle.com/cctp (incorporated at Compl. ¶ 32 n.4) (Solana-specific attestation timing available on website under "Get Started" and "Finality and Block Confirmations" tabs).

[10] Plaintiffs allege that CCTP's "sole purpose is money transmission." Compl. ¶ 58. The Court must accept that as true for the purpose of this motion. But in fact, CCTP is a permissionless software program that is distinct from the regulated money transmission services that Circle LLC provides to its actual customers.

price of Bitcoin will rise or fall" and "make deposits to earn interest from Drift's lending features." *Id.* ¶ 41. Because Drift Protocol is "built on the Solana blockchain," it "relies on [Solana's] infrastructure to execute trades, track balances, and manage user accounts." *Id.* ¶ 42. To access Drift Protocol, users deposit tokens as collateral into the exchange's smart-contract platform. *Id.* ¶ 41. Under its terms of use, Drift Protocol prohibits U.S. citizens and residents from accessing certain of its services, including perpetual futures contracts, and warns of "technological and security risks" associated with the exchange.[11]

On April 1, 2026, Drift Protocol was infiltrated by a group of suspected North Korean cybercriminals who had been plotting the exploit since fall 2025. *Id.* ¶¶ 44-46. According to the Complaint, the hack depended on successfully "induc[ing] Drift's Security Council members" to "pre-sign transactions" that allowed draining the exchange's funds "[w]ithin minutes." *Id.* ¶¶ 45, 47. The alleged hackers quickly stole over $285 million worth of cryptocurrency tokens. *Id.* ¶ 47.

From there, in an attempt to evade law enforcement, the hackers engaged in a series of transactions with the stolen cryptocurrency. *Id.* ¶¶ 47-49. First, the hackers exchanged all the stolen non-USDC cryptocurrency for USDC, presumably through one or more exchanges, though the Complaint does not allege when, where, or how those transactions occurred. *Id.* ¶ 47. Second, the hackers transferred the USDC from the Solana blockchain to the Ethereum blockchain—in part, through the use of CCTP. *Id.* ¶ 48. Third, the hackers exchanged the USDC for ether, a "cryptocurrency that cannot be frozen or seized and may be concealed with the use of third-party applications, like TornadoCash," *id.* ¶ 49, again presumably through one or more exchanges. Fourth, the hackers transferred the ether to over one hundred wallets where it is allegedly "unreachable from law enforcement and unrecoverable." *Id.* ¶ 50.

---

[11] *See* Drift, Terms of Use, https://docs.drift.trade/protocol/legal-and-regulations/terms-of-use.

Defendants are not alleged to have played any role in the theft itself, in the multiple exchanges of the stolen cryptocurrency, or in its transfer into the allegedly unreachable wallets. Nor are Defendants alleged (i) to have played any role in the operation of Drift Protocol or the Solana blockchain, (ii) to have had any relationship with Plaintiffs or any Drift Protocol user, or (iii) to have held custody over any stolen assets. Nonetheless, Plaintiffs allege that Defendants could have prevented the hackers from escaping with the stolen assets by acting either "to freeze the [stolen] assets on a smart-contract level" or to "blacklist the [hackers'] wallet addresses from CCTP." *Id.* ¶ 48.

But Plaintiffs do not identify any court order or law enforcement official that directed Defendants to take those actions. Instead, Plaintiffs contend that Defendants should have acted on their own initiative within hours of the hack based on either (i) reading social media posts or (ii) receiving unspecified communications from Drift Protocol and "other [unnamed] crypto players." *Id.* ¶¶ 52-57. The entire "getaway operation" is alleged to have taken eight hours. *Id.* ¶¶ 4, 48. Although the alleged use of CCTP was only the second step in the "getaway," Plaintiffs do not allege when that step occurred within the eight-hour window. And Drift Protocol itself announced that it had experienced an attack roughly four hours into that period. *Id*. ¶ 56.

## V. STATEMENT OF THE PLAINTIFFS AND CLAIMS.

Plaintiffs are six individuals and one limited liability company. Compl. ¶¶ 66-86. Three are U.S. citizens, two are Singaporean citizens, and one is a German citizen. *Id*. ¶¶ 10-16. While Plaintiffs allege that each of them deposited unspecified assets into Drift Protocol, and that those assets were later stolen, *id*. ¶¶ 66-86, they do not allege that they deposited or possessed USDC. Nor do Plaintiffs describe how the hackers converted the stolen tokens into (or from) USDC, including which exchanges they allegedly used for those conversions. Also, the Complaint lacks any details to tie any stolen assets to specific transactions using CCTP. *Id*. Further, the Complaint

alleges nothing about whether Plaintiffs complied with terms of Drift Protocol, including the prohibition on U.S. citizens accessing certain services of the exchange.[12]

Plaintiffs also do not assert any claims against the hackers or against Drift Protocol for the security lapses that allowed that exploit to occur. Instead, the Complaint focuses on the allegation that Defendants did not intervene to "freeze" the stolen cryptocurrency or immediately "blacklist the [hackers'] wallet addresses" from CCTP. *Id.* ¶ 48. The Complaint uses that inaction as the sole basis for pleading one count of aiding and abetting conversion, *id.* ¶¶ 98-104, and one count of negligence, *id.* ¶¶ 105-110. Plaintiffs seek class certification, damages, and attorneys' fees.

## ARGUMENT

### I. THIS COURT LACKS PERSONAL JURISDICTION OVER CIGI.

Plaintiffs bear the burden to establish personal jurisdiction. *See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). To do so, Plaintiffs must plausibly allege facts that show either specific or general jurisdiction. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Plaintiffs fail to do both.

**Specific Jurisdiction.** A court may exercise specific jurisdiction only when the lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017) (citation omitted). The Massachusetts long-arm statute, which imposes a similar requirement, requires that the defendant transacted business in Massachusetts and that the plaintiff's claim arose from that business. *Baskin-Robbins,* 825 F.3d at 34 n.3 (citation omitted); *see* Mass. Gen. Laws ch. 223A, § 3(a). The Complaint contains only two allegations unique to CIGI—(1) that CIGI is a Delaware corporation with its

[12] These significant omissions raise serious questions about whether Plaintiffs can certify a class.

primary place of business in New York and (2) that CIGI, the ultimate parent company of Circle LLC, is a distinct corporate entity. Compl. ¶¶ 17-18.

But neither allegation satisfies specific jurisdiction, and since Plaintiffs do not allege that Circle LLC and CIGI are alter egos, Circle LLC's "contacts with Massachusetts cannot be imputed to [CIGI] for purposes of personal jurisdiction." *Bridge Street Auto., Inc. v. Green Valley Oil, LLC*, 985 F. Supp. 2d 96, 112 (D. Mass. 2013); *see also Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (subsidiary company's ties to state does not confer jurisdiction over its nonresident parent). Nor can Plaintiffs establish specific jurisdiction over CIGI by ignoring the distinction between CIGI and Circle LLC, and instead referring to both entities "collectively" as "Circle." *E.g.*, Compl. ¶¶ 1, 20. This group pleading—"without identifying which specific Defendants took particular actions"—is "not enough to establish jurisdiction," *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 34-35 (D. Mass. 2024), because personal-jurisdiction requirements "must be met as to each defendant," *Rush v. Savchuk*, 444 U.S. 320, 332 (1980).

**General Jurisdiction.** A court may exercise general jurisdiction only when a corporation's "affiliations with the State [are] so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted). That requirement is satisfied when the forum state is a corporation's place of incorporation or principal place of business. *Id.* at 924. But as noted above, CIGI is a Delaware corporation with its primary place of business in New York. Compl. ¶ 17. And while there are "exceptional case[s]" in which a corporation may be at home in a "forum other than its formal place of incorporation or principal place of business," *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014), Plaintiffs have not alleged any facts that could support such an argument here. This Court should therefore dismiss all claims against CIGI for lack of personal jurisdiction.

## II. THE COMPLAINT STATES NO LEGALLY PLAUSIBLE CLAIMS.

Plaintiffs also fail to state legally plausible claims, which requires that the Complaint be dismissed under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Plaintiffs do not plead any specific allegations to either CIGI or Circle LLC.

As noted above, Plaintiffs disregard the distinction between CIGI and Circle LLC by referring to them collectively as "Circle" throughout the Complaint. Compl. ¶ 1. "In response to a motion to dismiss, [the court] must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009). And "[i]t is a well-settled general principle of corporate law that a parent corporation is not liable for the acts of its subsidiaries" absent allegations of alter ego or vicarious liability. *Henderson v. Bank of New York Mellon Corp.*, 146 F. Supp. 3d 438, 444 (D. Mass. 2015). Because Plaintiffs neither invoke those theories of liability nor plead specific facts as to CIGI or Circle LLC individually, the Complaint states no plausible claims.

### B. Plaintiffs have not plausibly alleged aiding and abetting.

Even putting aside that defect, Plaintiffs fail to plausibly allege the aiding and abetting of conversion. To establish aiding and abetting under Massachusetts law, a plaintiff must plausibly allege (1) that a third party committed a tort; (2) that a defendant "knew [the third party] was committing the tort;" and (3) that the defendant "actively participated in or substantially assisted in [the] commission of the tort." *Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 463 Mass. 50, 64 (2012) (citation omitted). Substantial assistance requires an affirmative act that was a "substantial factor" in the tort's completion, *Mass. Port Auth. v. Turo Inc.*, 487 Mass. 235, 244 (2021), and that went beyond the provision of routine businesses services, *see Hollis v. JPMorgan Chase Bank, N.A.*, No. 12-10544-JGD, 2014 WL 12792255, at *8 (D. Mass. Dec. 10, 2014).

In addition, the defendant must have had actual knowledge of its "substantial, supporting role in an unlawful enterprise," *Maruho Co. v. Miles, Inc.*, 13 F.3d 6, 10 (1st Cir. 1993) (citation omitted), and "share[d] the mental state" of the underlying tortfeasor, *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 n.21 (1st Cir. 2009) (citing *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 481 (1994)).[13] These requirements are demanding, and for a good reason: aiding and abetting has traditionally required showing "conscious, 'culpable conduct'" to avoid placing liability on "innocent bystanders"—such as a person who watches a robbery without calling the police. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488-89, 492 (2023) (citation omitted). Plaintiffs here come nowhere close to alleging such conscious, culpable conduct.

**1. The alleged facts do not constitute substantial assistance.**

This Court should dismiss Plaintiffs' aiding-and-abetting claim for failing to allege substantial assistance. Plaintiffs' core allegation is that "Circle" substantially assisted the hackers by not taking affirmative steps to (i) freeze USDC assets allegedly derived from the exploit of Drift Protocol or (ii) block the hackers from using CCTP. Compl. ¶¶ 48, 63, 101-103. But these allegations amount to criticizing "Circle" for its *inaction*. And by its nature, mere inaction does not constitute substantial assistance, as needed to establish aiding and abetting.

[13]The Massachusetts Supreme Court's recitation of the elements of aiding and abetting in *Go-Best* omitted the requirement from *Planned Parenthood League* that the defendant must share the mental state of the underlying wrongdoer. *See Turo*, 487 Mass. at 246 n.4 (discussing omission and finding *Planned Parenthood League* standard satisfied in pending case). Consistent with *Planned Parenthood League*, the First Circuit and this Court have repeatedly construed Massachusetts law to require "unlawful intent." *See, e.g.*, *Taylor*, 576 F.3d at 35 n.21; *Rosenberg v. Mass. Mut. Life Ins. Co.*, No. 23-CV-10441-FDS, 2024 WL 421780, at *6 (D. Mass. Feb. 5, 2024); *Adams v. Gissell*, No. 20-CV-11366-PBS, 2021 WL 8316261, at *12 (D. Mass. Dec. 8, 2021); *Mansor v. JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 269 (D. Mass. 2016); *Hollis*, 2014 WL 12792255, at *6; *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 90 (D. Mass. 2002).

Under Massachusetts law, "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Mansor*, 183 F. Supp. 3d at 265-66 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)); *accord Ferrante v. Santander Bank, N.A.*, 680 F. Supp. 3d 52, 59 (D. Mass. 2023); *see also Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*, 447 Mass. 616, 623 (2006) (likewise requiring an "independent [fiduciary] duty"). And Plaintiffs do not allege that Defendants owed them a fiduciary duty. Nor could they plausibly do so where they allege *no* relationship with Defendants. *See generally Islam v. Option One Mortg. Corp.*, 432 F. Supp. 2d 181, 195 (D. Mass. 2006) (holding financial institution did not owe fiduciary duty to customers). While some courts have suggested that inaction can give rise to aiding-and-abetting liability when it is "designed intentionally to aid the primary [wrongdoing]," Plaintiffs do not (and could not) allege such an intent here. *Mansor*, 183 F. Supp. 3d at 266. Thus, Plaintiffs fail to plausibly allege substantial assistance to the hackers.

This Court's decision in *Ferrante* confirms the point. The plaintiff there was the victim of a phishing scam, which induced him to wire a substantial sum to an account held by the defendant, Santander Bank, N.A. *See* 680 F. Supp. 3d at 56-57. When one of the bank's employees uncovered the fraudulent scheme, the employee told the plaintiff that his account was "locked down" and that his funds were "secured." *Id.* at 57. But the funds were not actually secured, and the fraudster obtained a large share of the wired funds. *See id.* This Court held that the bank had "actual knowledge" of the fraudulent scheme as it occurred. *Id.* at 58-59. But even so, the Court granted a motion to dismiss the aiding-and-abetting claim because the bank's failure to "secure" the relevant funds was "mere inaction" that did not constitute substantial assistance of the underlying conversion. *Id.* at 59. That same conclusion applies even more here, where Plaintiffs do not even

allege that Defendants—which are not banks—ever held custody of the stolen assets, making them even less connected to the underlying scheme than the bank was in *Ferrante*.

Plaintiffs attempt to fault Defendants for declining "to freeze the [stolen] assets on a smart-contract level" or "blacklist the [hackers'] wallet addresses from CCTP." Compl. ¶ 48; *see also id.* ¶¶ 35-36, 60, 63, 101. But those are allegations of mere *inaction*. To freeze USDC in the hackers' wallets, Plaintiffs acknowledge that Circle LLC would have had to take affirmative steps, *id*. ¶¶ 35-36, 64, which under its policy required a court order or government request. *See supra* 4-5. And although Plaintiffs assert that CCTP "requires an affirmative, centralized attestation," *id.* ¶ 32, Plaintiffs do not (and could not) allege that Defendants made any affirmative decision regarding the attestation of the relevant transactions. Those programmatic and non-discretionary attestations occur automatically—and in a matter of seconds—via self-executing smart contracts. *See supra* 5-6. Indeed, Plaintiffs' incorporated documents acknowledge that CCTP is "permissionless," meaning that third parties can integrate it into their own (non-Circle) products to allow their own (non-Circle) customers to transfer USDC across blockchains. *See supra* 5. For all those reasons, Plaintiffs' allegation that "Circle" did not take steps to affirmatively freeze USDC or block access to generally-available CCTP technology is not sufficient to state a claim.

Even assuming that the hackers' use of CCTP involved *de minimis* routine service by Defendants, that would not change the outcome. Aiding-and-abetting liability requires either "active[] participat[ion] or substantial[] assist[ance]." *Go-Best*, 463 Mass. at 64. And courts have consistently held that routine business practices do not rise to the level of substantial assistance. *See, e.g.*, *Wood v. Bank of Am., N.A.*, No. 24-CV-11430-DJC, 2025 WL 894650, at *8 (D. Mass. Mar. 24, 2025) ("'[T]he provision of routine bank services typically does not constitute substantial assistance' unless the bank 'has actual knowledge that its routine services are assisting a customer

in committing a specific tort.'" (citation omitted)); *Hollis*, 2014 WL 12792255, at *8 (a bank's "provision of remote deposit and wiring services" was not substantial assistance); *In re State St. Cases*, No. 12-CV-11770-NMG, 2013 WL 5508151, at *23 (D. Mass. Aug. 21, 2013), *adopted in relevant part*, 2013 WL 5508349 (D. Mass. Sept. 27, 2013) (the "mere settling of a transaction or providing of a platform, without more, cannot sustain a charge of substantial assistance"). The conduct alleged against Defendants, which are not banks and provided no services of any kind to Plaintiffs, is even further removed from the harmful conduct than were the banking services in those cases. It follows *a fortiori* that there was no substantial assistance here.

The Complaint also lacks allegations of affirmative acts by Defendants that were a "substantial factor" in the tort's completion. *Turo*, 487 Mass. at 244. Plaintiffs do not (and could not) allege that Defendants have any relationship with the hackers. Nor do they allege that Defendants played any role in the theft itself, the multiple exchanges of the stolen cryptocurrency, or its ultimate transfer into the allegedly unreachable wallets. Plaintiffs concede that they cannot recover their assets due in part to "third-party applications, like TornadoCash." Compl. ¶ 49. Thus, it is implausible that Defendants—by taking no action to block the hackers from transferring USDC or using generally-available technology—played a "substantial" role in the alleged heist.

A contrary conclusion on this issue would expand aiding and abetting beyond its traditional, legitimate scope. The Supreme Court recently emphasized that it would take aiding and abetting "too far" to make "ordinary merchants … liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Twitter*, 598 U.S. at 489. For that reason, the Supreme Court held that Twitter's mere "provision of [social media] infrastructure" did not constitute substantial assistance of the terrorist groups that happened to benefit from that infrastructure. *Id.* at 499. This authority forecloses holding that merely providing the CCTP

blockchain infrastructure was substantial assistance to third-party criminals. Thus, the aiding-and-abetting claim must be dismissed.

**2. Plaintiffs fail to allege a culpable mental state.**

Plaintiffs also fail to allege the required mental state for aiding and abetting. Under Massachusetts law, Plaintiffs must plausibly allege that Defendants had "actual knowledge" of the hackers' wrongdoing, *Cahaly v. Benistar Prop. Exch. Tr. Co.*, 451 Mass. 343, 355 (2008), as well as a "substantial, supporting role [in the hackers'] enterprise," *Maruho*, 13 F.3d at 10. In addition, "Massachusetts aiding and abetting liability generally requires that a defendant share the mental state of the principal violator." *Taylor*, 576 F.3d 16, 35 n.21; *see also Planned Parenthood League*, 417 Mass. at 481. In other words, Plaintiffs must plausibly establish an "unlawful intent," meaning "knowledge" of the hackers' wrongdoing and "the intent to assist [the hackers'] action." *Hollis*, 2014 WL 12792255, at *6 (citation omitted).

Plaintiffs' allegations come nowhere close to establishing that culpable mental state. Plaintiffs allege that "Circle" learned about the Drift Protocol "exploit and the hackers' use of USDC" through two sources: First, "Circle" allegedly learned of it through "continuing updates and discussion on X," a social media company formerly called Twitter. *Id.* ¶ 57; *see also id.* ¶¶ 52-56. Second, "Circle" allegedly learned of it through "direct contact from Drift and other crypto players" regarding that same exploit. *Id.* ¶ 57. But Circle LLC has a policy of taking action only in response to court orders or official government requests—precisely because acting on unverified tweets and requests from non-governmental sources can lead to arbitrary decisions that harm innocent third parties. Plaintiffs' allegations about social media chatter and "crypto players" do not remotely establish that Defendants knew about the Drift Protocol exploit as it occurred. Nor do they establish that Defendants knew about their own supposedly "substantial, supporting role" in the exploit's accomplishment. *Maruho*, 13 F.3d at 10. For example, Plaintiffs do not allege that

Defendants knew that not freezing certain wallets associated with the hackers would lead to the stolen funds becoming unrecoverable. *See* Compl. ¶¶ 41-43. Nor do they allege that Defendants understood they had a supposedly central role in the hackers' fast-moving "getaway." *Id.* ¶ 30.

Beyond that, Plaintiffs do not allege that Defendants "share[d] the mental state" of the hackers. *Planned Parenthood League*, 417 Mass. at 481; *see also Taylor*, 576 F.3d at 35 n.21; *Hollis*, 2014 WL 12792255, at *6. In particular, Plaintiffs do not (and could not) allege that Defendants shared the hackers' goal of stealing the tokens. And that omission is dispositive. *See Hollis*, 2014 WL 12792255, at *9. Because Plaintiffs have failed to allege that Defendants had a "conscious, culpable" mental state, this Court should dismiss their aiding-and-abetting claim. *Twitter*, 598 U.S. at 492 (citation omitted).

**C. Plaintiffs have not plausibly alleged negligence.**

To state a claim for negligence, Plaintiffs must plead facts showing that Defendants "owed [them] a duty of reasonable care, that [they] committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage." *Go-Best Assets*, 463 Mass. at 54. Here, the negligence claim fails because Defendants did not owe them a duty of care and also because it is barred by the Massachusetts economic-loss rule.

**1. Defendants did not owe Plaintiffs a duty of care.**

To plead negligence, Plaintiffs must show that Defendants owed Plaintiffs a duty to protect their tokens from third-party hackers. But Plaintiffs do not allege that they were customers of Defendants. Nor do they allege that Defendants held custody of their tokens, or that Defendants had a business relationship with the hackers or Drift Protocol. Thus, Plaintiffs' negligence claim depends on showing that stablecoin issuers (Circle LLC) or their ultimate corporate parents (CIGI) have a duty to protect non-customers from the criminal transfer of stablecoins by other non-customers.

Plaintiffs have not identified any state statute or judicial precedent that even arguably imposes such a duty. Indeed, while Defendants are not banks and did not provide any services to Plaintiffs, case law involving banks is instructive—and completely forecloses Plaintiffs' position. Generally speaking, banks have "no duty to monitor the activities of authorized account-holders and prevent misappropriation." *Mansor*, 183 F. Supp. 3d at 274 (citation omitted). Courts have held that a bank's "failure to investigate a customer's suspicious activity … does not give rise to liability to the third party who is injured by the customer's fraud." *McCallum v. Rizzo*, No. 942878, 1995 WL 1146812, at *2 (Mass. Super. Oct. 13, 1995); *see also Go-Best Assets*, 463 Mass. at 54; *Garcia v. Santander Bank, N.A*., 105 Mass. App. Ct. 1123 (2025) (summary decision); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (collecting cases from other jurisdictions).[14] "The mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers." *Eisenberg*, 301 F.3d at 225 (quoting *McCallum*, 1995 WL 1146812, at *2).

That principle applies with even greater force to non-banks like Defendants, whose alleged conduct is even more tangential to the wrongdoing than the banking services in those cases. Indeed, Plaintiffs do not allege that Defendants had a customer or contractual relationship with the hackers, Drift Protocol, or the Plaintiffs themselves. Nor do they allege that Defendants ever had custody of the stolen assets. If the law imposes no duty on banks to protect non-customers from fraud by the banks' own customers, it plainly imposes no duty on Defendants to protect the non-customer Plaintiffs from the non-customer hackers.

[14] These rules admit a limited exception for when banks have actual knowledge of misappropriation occurring from a customer's account that the customer holds as a fiduciary to other parties, *see Mansor*, 183 F. Supp. 3d at 274, but those circumstances are not alleged here.

None of Plaintiffs' other allegations permit a different conclusion. First, Plaintiffs allege that the federal Bank Secrecy Act requires "Circle" to "monitor suspicious activity" over CCTP, *see* Compl. ¶ 58, but they are wrong, and they do not plead facts that plausibly support their misstatement of the law. As publicly available, permissionless software, CCTP is not subject to BSA requirements. *See* 31 U.S.C. § 5312(a)(2) (defining the "financial institution[s]" subject to that Act). Moreover, statutory duties do not "create a duty of care in tort in the absence of legislative intent to create a private right of action." *Go-Best Assets*, 463 Mass. at 61–62. And since the BSA "does not create a private right of action," Plaintiffs cannot use it to substitute for a state-law duty. *Gemstone Foods, L.L.C. v. JPMorgan Chase Bank, N.A.*, No. 26-60049, 2026 WL 1507876, at *3 (5th Cir. May 29, 2026). Second, Plaintiffs point to "Circle's" statements about "its monitoring capabilities and responsibilities," including the statement: "Fighting money laundering and terrorist financing is job #1." Compl. ¶ 59. But these statements have nothing to do with the claims in this case, and in any event did not create an enforceable agreement or duties owed to non-customers. *See Evans v. Lorillard Tobacco Co*., 465 Mass. 411, 446-47 (2013).

Finally, Plaintiffs allege that their alleged injuries were a "reasonabl[y] foreseeab[le]" result of Defendants' inaction, and that the foreseeability of their injuries sufficed to create a duty of care. *See* Compl. ¶ 107. But "foreseeability of harm[] is not the main factor in determining whether there is a legal duty of care." *Kendall v. Schedin*, No. 09-CV-40163-TSH, 2011 WL 2693914, at *5 (D. Mass. July 8, 2011). As discussed above, Massachusetts courts have declined to impose legal duties on financial institutions in circumstances where any harm was at least equally foreseeable. Moreover, Plaintiffs' position would have the implausible result of requiring bystanders to intervene in ongoing crimes, simply because the bystanders happen to be in a "unique

position to prevent [foreseeable] harm." Compl. ¶ 107. That is not the law. The negligence claim should be dismissed.

### 2. The economic-loss doctrine bars Plaintiffs' claims.

Plaintiffs' negligence claim is also barred by the economic-loss doctrine. As a general matter, that doctrine prevents stating a claim for negligence unless a plaintiff "can establish that the injuries [it] suffered due to the defendants' negligence involved physical harm or property damage, and not solely economic loss." *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 469 (2009); *see also FMR Corp. v. Bos. Edison Co.*, 415 Mass. 393, 395 (1993). Here, Plaintiffs have alleged only one injury—damages from the loss of their stolen cryptocurrency. Compl. ¶ 110. That injury is purely economic in nature. And Massachusetts courts have applied the economic-loss doctrine in similar circumstances. For example, the Massachusetts Supreme Court held in *Cumis* that the victims of a data breach could not state a negligence claim against the company responsible for losing their data, where the plaintiffs sought relief only for "fraudulent charges" and the "costs of replacing credit cards for compromised accounts." *Cumis*, 455 Mass. at 464, 469-70; *see also In re LastPass Data Sec. Incident Litig.*, 742 F. Supp. 3d 109, 124 (D. Mass. 2024) (similar). That holding prevents Plaintiffs from bringing a negligence claim against Drift Protocol under Massachusetts law. And by extension, the economic-loss doctrine prevents Plaintiffs from asserting a negligence claim against Defendants.

## CONCLUSION

The many defects identified above are intrinsic to the Complaint, and Plaintiffs cannot cure them. Accordingly, Plaintiffs' claims should be dismissed with prejudice under Rule 12(b)(2) and Rule 12(b)(6).

Dated: June 22, 2026

Respectfully submitted,

CIRCLE INTERNET GROUP, INC., and
CIRCLE INTERNET FINANCIAL, LLC,

By its counsel,

*/s/ Christopher M. Morrison*

Christopher M. Morrison, BBO# 651335
JONES DAY
680 Atlantic Avenue, Suite 2400
Boston, MA 02110
Telephone: 1.617.960.3939
Facsimile: 1.617.449.6999
cmorrison@jonesday.com

Paula S. Quist (admitted *pro hac vice*)
JONES DAY
110 N. Wacker Dr., Suite 4800
Chicago, IL 60606
Telephone: 1.312.269.4277
pquist@jonesday.com

Mark W. Rasmussen (admitted *pro hac vice*)
JONES DAY
2727 N. Harwood St., Suite 600
Dallas, TX 75201
Telephone: 1.214.969.4892
mrasmussen@jonesday.com

Alexander J. Wilson (admitted *pro hac vice*)
JONES DAY
250 Vesey St.
New York, NY 10281
Telephone: 1.212.326.8390
alexanderwilson@jonesday.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, the foregoing was filed through the Court's CM/ECF system and will be sent electronically to the registered participants.

*/s/ Christopher M. Morrison*
Christopher M. Morrison