**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JOSHUA MCCOLLUM, OAKFORD CRAWSON LLC, JEFFREY MAGOVENY, NG BOON MIN, LIM TECK YEOW, ALEXEJ KRAVETSKER, and MICHAEL MEDOVOJ, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

CIRCLE INTERNET GROUP, INC., and CIRCLE INTERNET FINANCIAL, LLC,

*Defendants*.

**Case No. 1:26-cv-11733-WGY**

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PLAINTIFFS' FACTUAL ALLEGATIONS .......... 1

- A. Overview of Cryptocurrencies and Blockchains .......... 1
- B. Circle's Stablecoin and Bridge Infrastructure .......... 2
- C. Circle Assists the Drift Attackers' $230 Million Escape. .......... 3
- D. Circle Had Actual Knowledge of the Conversion. .......... 5

III. LEGAL ARGUMENT .......... 6

- A. Plaintiffs Collectively Plead Both Defendants' Direct Involvement. .......... 6
- B. Plaintiffs Allege Facts Establishing Specific Personal Jurisdiction. .......... 7
- C. Plaintiffs State a Claim for Aiding and Abetting Conversion. .......... 8
  - 1. Plaintiffs Plausibly Allege Circle's "Actual Knowledge" .......... 9
  - 2. Plaintiffs Adequately Allege Circle's Substantial Assistance .......... 11
    - a. Plaintiffs Allege More Than "Mere Inaction" or "Routine" Services. .......... 11
    - b. Routine Banking Services or "Inaction" Qualify as Substantial Assistance. .......... 13
  - 3. Circle's Knowledge and Substantial Assistance Establish Intent. .......... 16
- D. Plaintiffs Have Pleaded a Viable Negligence Claim. .......... 18

IV. CONCLUSION .......... 20

## TABLE OF AUTHORITIES


Cases — Page(s)

*Adams v. Cong. Auto Ins. Agency, Inc.*,
90 Mass. App. Ct. 761 (2016) .......... 20

*Alianza Americas v. DeSantis*,
727 F. Supp. 3d 9 (D. Mass. 2024) .......... 7, 8

*Arcidi v. Nat'l Ass'n of Gov't Employees, Inc.*,
447 Mass. 616 (2006) .......... 13

*Bamberg v. SG Cowen*,
236 F. Supp. 2d 79 (D. Mass. 2002) .......... 13

*Barnia v. Kaur*,
2024 WL 914780 (D. Mass. Feb. 1, 2024) .......... 18

*Brown v. United States*,
557 F.3d 1 (1st Cir. 2009) .......... 18, 19

*Cahaly v. Benister Prop. Exch. Trust. Co., Inc.*,
451 Mass. 343 (2008) .......... 13

*Carr v. Town of Bourne*,
2023 WL 2918922 (D. Mass. Apr. 12, 2023) .......... 18

*Clark v. Rowe*,
428 Mass. 339 (1998) .......... 20

*Dittman v. UPMC*,
649 Pa. 496 (2018) .......... 20

*Ferrante v. Santander Bank, N.A.*,
680 F. Supp. 3d 52 (D. Mass. 2023) .......... 15

*Go-Best Assets Ltd. v. Citizens Bank of Mass.*,
463 Mass. 50 (2012) .......... 13, 15, 17, 19

*Hollis v. JPMorgan Chase Bank, N.A.*,
2014 WL 12792255 (D. Mass. Dec. 10, 2014) .......... 15, 18

*In re Aliera Cos., Inc.*,
2025 WL 2599852 (Bankr. N.D. Ga. Sept. 8, 2025) .......... 8, 14

*In re Allaire Corp. Secs. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) .......... 12

*In re State Street Cases*,
2013 WL 5508151 (D. Mass. Aug. 21, 2013) .......... 13, 15

*In re Telexfree Secs. Litig. ("TelexFree, I")*,
389 F. Supp. 3d 101 (D. Mass 2019) .......... 8, 13

*In re TelexFree Secs. Litig. ("TelexFree, II")*,
626 F. Supp. 3d 253 (D. Mass. 2022) .......... *passim*

*In re TelexFree Secs. Litig. ("TelexFree, III")*,
2023 WL 4399986 (D. Mass. Jan. 3, 2023) .......... *passim*

*Jupin v. Kask*,
447 Mass. 141 (2006) .......... 18, 19

*Kyte v. Philip Morris Inc.*,
408 Mass. 162 (1990) .......... 16, 17

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006) .......... 13

*Mansor v. JPMorgan Chase Bank, N.A.*,
183 F. Supp. 3d 250 (D. Mass. 2016) .......... 11, 13, 15, 17

*Martin v. Mead Johnson Nutrition Co.*,
2010 WL 3928710 (D. Mass. Sept. 13, 2010) .......... 7

*Mass. Port Auth. v. Turo, Inc.*,
487 Mass. 235 (2021) .......... *passim*

*Ortolani v. Cmty. of Jesus, Inc.*,
2026 WL 184705 (D. Mass. June 26, 2026) .......... 6

*Patriot Grp., LLC v. Edmands*,
96 Mass. App. Ct. 478 (2019) .......... 10

*Planned Parenthood League of Mass., Inc. v. Blake*,
417 Mass. 467 (1994) .......... 13, 16

*Portier v. NEO Technology Solutions*,
2019 WL 7946103 (D. Mass. Dec. 31, 2019) .......... 20

*Prime Hookah, Inc. v. M.K. Distribs., Inc.*,
2020 WL 3977381 n.8 (D. Mass. July 14, 2020) .......... 12

*Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*,
43 F.4th 150 (1st Cir. 2022) .......... 7

*Romano v. Computershare, Inc.*,
2019 WL 13219376 (D. Mass. Mar. 13, 2019) .......... 19

*Shedd v. Sturdy Mem'l Hosp., Inc.*,
2022 WL 1102524 (Mass. Super. Apr. 5, 2022) .......... 20

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018) .......... 9

*Taylor v. Am. Chem. Council*,
576 F.3d 16 (1st Cir. 2009) .......... 13

*Thomas v. Harrington*,
909 F.3d 483 (1st Cir. 2018) .......... 16, 17

*Williams v. Steward Health Care Sys., LLC*,
480 Mass. 286 (2018) .......... 18

*Wofse v. Horn*,
523 F. Supp. 3d 122 (D. Mass. 2021) .......... 18

*Wood v. Bank of Am., N.A.*,
2025 WL 894650 (D. Mass. Mar. 24, 2025) .......... 11, 13, 15, 18

*Zond, Inc. v. Fujitsu Semiconductor Ltd.*,
990 F. Supp. 2d 50 (D. Mass. 2014) .......... 6, 7, 8

Statutes

31 U.S.C. § 5311 .......... 3

Rules

Fed. R. Civ. P. 8(a) .......... 1

## I. INTRODUCTION

The Court should deny the motion to dismiss by Defendants Circle Internet Group, Inc. ("CIGI") and Circle Internet Financial, LLC's ("CIF") (together, "Circle"). Circle's arguments for dismissing Plaintiffs' claims for aiding and abetting and negligence mischaracterize Plaintiffs' allegations and misunderstand the law.

First, Plaintiffs adequately plead each defendant's personal and direct involvement, and the complaint provides them both fair notice of the allegations against them as required by Fed. R. Civ. P. 8(a). Those allegations also establish personal jurisdiction as to CIGI.

Second, on the aiding and abetting claim, Plaintiffs have adequately alleged facts showing Circle's actual knowledge of the conversion scheme—early on and in real time—through direct communications with Drift, the best source about the exploit. Circle nonetheless provided technology and services to aid cybercriminals linked to North Korea in stealing hundreds of millions of dollars in cryptocurrency belonging to Plaintiffs and the proposed Class. This knowing assistance establishes the intent necessary for aiding and abetting under Massachusetts law.

Third, as to negligence, Plaintiffs allege that Circle knew its actions put them in foreseeable harm. That is sufficient to establish both Circle's tort duty and the inapplicability of the economic loss rule. For all these reasons, set forth fully below, the motion should be denied.

## II. PLAINTIFFS' FACTUAL ALLEGATIONS

### A. Overview of Cryptocurrencies and Blockchains

Cryptocurrencies are digital assets that can be traded, used to secure loans or buy goods, or held as investments. (AC ¶ 22.)[1] Individual cryptocurrencies, like Bitcoin or Ether, are called

[1] Citations to "AC" are to the Amended Class Action Complaint, filed on May 11, 2026, Dkt. 4.

"tokens," and these assets are held in, and transferred between, digital "wallets" with unique addresses. (*Id.*) Tokens like Bitcoin and Ether can swing wildly in value. (*Id.* ¶ 24.) Other tokens, called stablecoins, maintain fixed values because they represent non-digital assets, such as U.S. dollars or treasury bills. (*Id.*)

Cryptocurrencies exist on blockchains, digital ledgers that record transactions across a network of computers, instead of in a bank, business, or government. (*Id.* ¶ 23.) Solana is a high-speed blockchain designed for very fast, low-cost transactions. (*Id.* ¶ 26.) Many Solana-based tokens are created with built-in "freeze authority" functions under the network token's standards, allowing issuers to freeze wallets or tokens if they retain authority to do so. (*Id.*) Another block-chain is Ethereum, whose native asset is called Ether. (*Id.* ¶ 27.) Ether cannot be frozen or black-listed by private issuers because it is built without administrative functions in its code. (*Id.*)

**B. Circle's Stablecoin and Bridge Infrastructure**

Circle touts itself as a "full-stack platform for the new internet financial system," combining "blockchain infrastructure, digital assets, [and] applications into a single, integrated foundation for modern finance." (*Id.* ¶ 29.) Circle's main product is its stablecoin USDC, the most widely used stablecoin in the U.S. (*Id.* ¶ 30.) USDC is pegged to the U.S. dollar, and each USDC is backed by $1 in actual reserves. (*Id.* ¶ 24.) Its stability and wide adoption allow users to move in and out of crypto positions quickly without having to convert assets to "bank" money each time. (*Id.* ¶ 30.) Circle mints USDC natively on many blockchains. (*Id.* ¶ 43.)

Another core Circle product is its Cross-Chain Transfer Protocol ("CCTP"), which allows users to move USDC across different blockchains. (*Id.* ¶ 31.) For example, when a user wants to move USDC from the Solana blockchain to the Ethereum blockchain via CCTP, Circle "burns" (destroys) each Solana-based USDC and "mints" (creates) one new Ethereum-based USDC in its

place. (*Id.*) This requires an affirmative, centralized attestation from Circle before newly minted USDC is released to the destination chain. (*Id.* ¶ 32.) Without it, the transfer will fail before it is finalized. (*Id.*) The resulting USDC, though on a different blockchain, remains subject to Circle's control. (*Id.* ¶ 33.) Circle can freeze USDC to prevent any trade or bridge to another blockchain and can also block specific wallets from using its CCTP. (*Id.* ¶ 35.)

Under the Bank Secrecy Act (31 U.S.C. § 5311, *et seq*.), Circle must monitor for suspicious activity on CCTP because its sole purpose is money transmission. (*Id.* ¶ 58.) Circle recognizes its responsibilities and capabilities in a video on its website stating:

> We use AI and advanced tools to stay ahead of financial crime risk. Why so much investment in risk management? Because it's essential to building financial infrastructure that scales globally. And it's the right thing to do. Fighting money laundering and terrorist financing is job #1 . . . . We conduct blockchain and transaction monitoring . . . . We aim not just to comply, but to exceed the expectations of those who depend on us.

(*Id.* ¶ 59.) Despite those promises, Circle is notorious for providing technology and services to cybercriminals, so much so that it has been labeled a "bad actor" by one top crypto commentator, even before the Drift exploit. (*Id.* ¶¶ 38, 60.) In January 2026, Circle refused to freeze USDC stolen in a $13 million SwapNet exploit, despite pleas from law enforcement and security experts. (*Id.* ¶ 38.) And in May 2025, Circle's CCTP bridged $61 million in stolen USDC; Circle then waited a month before blacklisting the attackers' wallet. (*Id.*) In the four years before the Drift exploit, Circle repeatedly provided unfettered use of its USDC and bridge services to cybercriminals in 14 large breaches, amounting to $188 million in unrecoverable, misappropriated funds. (*Id.* ¶¶ 37 & n.5, 38 (totaling $420 million with the losses alleged here).)

**C. Circle Assists the Drift Attackers' $230 Million Escape.**

On April 1, 2026, a cybercriminal group linked to North Korea's government absconded with over $230 million in stolen crypto assets. (*Id.* ¶¶ 44, 48.) First, the Attackers took

administrative control over Drift Protocol, a decentralized cryptocurrency exchange built on the Solana blockchain. (*Id.* ¶¶ 42, 46.) Within minutes (at 11:15 a.m. EDT), they drained Drift of over $285 million in crypto assets, which they quickly swapped for Circle's USDC. (*Id.* ¶¶ 47, 51.) The Attackers then began the long process of moving those USDC to the Ethereum blockchain and trading them for Ether, which cannot be frozen or recovered. (*Id.* ¶¶ 48-50.)

The Attackers had options for bridging these assets across blockchains. For example, they might have put the stolen value into USDT, a competing stablecoin run by Tether, and then transferred it over the USDT0 bridge, the Tether-based analogue of CCTP. (*Id.* ¶ 62.) USDT0's operators, however, froze its bridge within 29 minutes of the hack, so "not a single compromised dollar [could] move[] through [their] rails." (*Id.*) The Attackers tried to move some assets in the form of another token called USDY, but its issuer Ondo Finance successfully froze $537,000 in USDY after learning of the Attackers' scheme. (*Id.*) Two large transfers attempted via the bridge Wormhole were also locked in transit. (*Id.*) And the bridge toolkit company SwapKit disabled its Solana bridge functionality even before Drift alerted the public to the exploit. (*Id.* ¶ 54.)

The Attackers, however, counted on Circle to help transfer most of the stolen Drift assets, given its track record of facilitating financial cybercrimes. (*Id.* ¶¶ 48, 60.) And Circle did perform these transfers, in over 100 separate CCTP transactions spanning eight hours and resulting in $230 million in assets unrecoverable from the Ethereum blockchain. (*Id.* ¶ 48.) Specifically, Circle "burned" each Solana-based USDC representing stolen assets, then "minted" the equivalent in Ethereum-based USDC for the Attackers. (*Id.*) At the time, Circle knew of the exploit and the Attackers' use of USDC and CCTP. *See* Part II.D, *infra*. Circle could have stopped bridging the stolen assets onto Ethereum or frozen the USDC, either before or after that bridging, to prevent Drift users' losses. (AC ¶¶ 60, 61.) The only reason the Attackers did not

abscond with the full $285 million stolen is that other bridges and token issuers, unlike Circle, would not provide or else stopped providing these services after learning of the attack. (*Id.* ¶ 62.)

**D. Circle Had Actual Knowledge of the Conversion.**

Circle knew about the Drift attack yet continued to provide the services needed to abscond with the stolen funds. First, Circle learned of the exploit through direct, private communications with Drift and other crypto players, who were following the developments. (*Id.*¶ 57.) Drift's own posts on X.com confirm Drift was "coordinating with multiple security firms, bridges, and exchanges to contain the incident." (*Id.* ¶ 56.)

Shortly after the attack, commentators, crypto investigators, and victims flocked to X to discuss the Drift exploit. (*Id.* ¶¶ 52-55.) The alleged timeline of the attack and its public discussion is as follows:

- 11:15 a.m. EDT: The Attackers drain Drift of $285 million in assets.
- 12:15 p.m. EDT: Major crypto influencer @mert posts to 447,000 followers on X, "hello someone from circle reach out asap, seeing high likelihood of potentially large exploit."
- 12:45 p.m. EDT: SwapKit disables its Solana bridge functionality to thwart the Drift Attackers.
- 2:10 p.m. EDT: Drift posts to X that it has detected unusual activity on its protocol and implores users not to deposit funds.
- 2:58 p.m. EDT: Drift posts that it "is experiencing an active attack," has suspended deposits/withdrawals, and is "coordinating with multiple security firms, bridges, and exchanges to contain the incident." It adds, "This is not an April Fool's joke."
- 7:15 p.m. EDT: Bridging of stolen assets on CCTP concludes.

(*Id.* ¶¶ 4, 53-56.) Throughout this timespan, "countless mentions" and "[d]iscussions of the exploit" "flooded" and "proliferate[d]" across X. (*Id.* ¶¶ 54, 55.)

About two weeks after the Drift exploit, Circle CEO Jeremy Allaire spoke at a Circle-focused conference in South Korea. (*Id.* ¶ 64.) Allaire defended Circle's unquestioning transfer of the stolen assets on grounds that asking a private company to "mak[e] its own decisions"

about "what is the right path" poses a "moral quandary." (*Id.* ¶ 64 & n.20.) He did not deny that Circle had knowingly provided the services or could have restricted those services. (*Id.*) He instead reiterated its stated policy of restricting services only pursuant to court orders. (*Id.*)

## III. LEGAL ARGUMENT

### A. Plaintiffs Collectively Plead Both Defendants' Direct Involvement.

Defendants fault Plaintiffs because their pleading does not allege what CIGI and CIF each did *specifically* that gives rise to liability. (Br. at 17.) But "there is no general rule prohibiting group pleading" nor any "require[ment] to allege that any [d]efendant acted as the alter ego of another." *Ortolani v. Cmty. of Jesus, Inc.*, 2026 WL 184705, at *6 (D. Mass. June 26, 2026) (Sorokin, J.). Where a complaint consistently groups two defendants together, each receives fair notice that every allegation is directed at it individually, satisfying the purpose of Rule 8(a). *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53-54 (D. Mass. 2014) (Young, J.). Here, Plaintiffs allege both Defendants were personally and directly involved in the same culpable conduct. (AC p.1 & ¶ 20.)

This Court approved nearly identical group pleading in *Zond.* There, defendants Fujitsu Ltd. and Fujitsu USA (a parent and subsidiary) challenged the plaintiffs' "decision to treat" them as an "undifferentiated mass" called "Fujitsu" and "to make all allegations against the group as a whole." 990 F. Supp. 2d at 53. The Court found no issue, so long as it was not "'entirely implausible' or impossible for the grouped defendants to have acted as alleged"—even if "a stretch." *Id.* (citations omitted); *see also id.* ("[I]t is not for the Court to evaluate, at this stage, whether the plaintiff will be able to obtain the necessary evidence to prove its claims.").

The Court further observed that "determining the exact operations of the [] corporate group, and thus the relevant assignment of potential liability, requires corporate structure

information that is not readily available to the public." *Id.* While Circle's jurisdictional argument disclaims CIGI's control over USDC and the CCTP, its public filings[2] state that CIGI "launched CCTP" and views it "as a key driver of our future growth." 2025 Form 10-K at 10. It also touts USDC as the "anchor[]" of its platform and that it "will continue to add USDC to new chains." *Id.* at 9. This is consistent with Defendants' website copy, which refers to them just as "Circle." (*See, e.g.*, AC ¶ 29 nn.1-3.) As in *Zond*, it is "illogical to allow [Circle] to escape liability because of its ability to keep its corporate structure confidential." 990 F. Supp. 2d at 53; *see also Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 172 (1st Cir. 2022) ("Certain information, such as the structure and responsibility of each distinct entity, may often be unavailable to the plaintiff at this early stage of litigation." (citing *Zond*, 990 F. Supp. 2d at 53-54)).

**B. Plaintiffs Allege Facts Establishing Specific Personal Jurisdiction.**

Defendants challenge the Court's personal jurisdiction over CIGI on grounds that it is a foreign corporation with insufficient contacts in this forum. (Br. at 15-16.) As explained above, Plaintiffs allege that CIGI's liability arises from its own "unlawful conduct in Massachusetts." (AC ¶ 20 ("Circle's actions and decision-making . . . took place at the Boston headquarters of Circle Internet Financial.").) Accordingly, Plaintiffs' allegations establish specific jurisdiction over CIGI; no *alter ego* theory need be pleaded.

Defendants' case, *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9 (D. Mass. 2024), is distinguishable because the group pleading impermissibly covered *nine* defendants, four of whom were sued in both personal and official capacities. *Id.* at 26. Those allegations did "not

[2] Circle Internet Group, Inc., Form 10-K, Dec. 31, 2025 ("2025 Form 10-K"), available at https://bit.ly/4f3b9M1; *see also Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928710, at *2 (D. Mass. Sept. 13, 2010) (Dein, M.J.), *report and recommendation adopted in part, rejected in part*, 2010 WL 3928707 (D. Mass. Sept. 30, 2010) ("The public filing of a [Form 10-K] with a regulatory agency makes it a proper subject of judicial notice." (cleaned up)).

allow the [c]ourt to determine over which [d]efendants jurisdiction is proper." *Id.* at 36. Here, Plaintiffs have sufficiently alleged CIGI's direct conduct in the forum state, which establishes personal jurisdiction. *Zond*, 990 F. Supp. 2d at 53-54.

**C. Plaintiffs State a Claim for Aiding and Abetting Conversion.**

To plead a claim for aiding and abetting under Massachusetts law, a plaintiff must allege that: "(1) a tortfeasor committed an underlying tort; (2) the defendant knew that the tortfeasor was committing the underlying tort; and (3) the defendant actively participated in or substantially assisted the tortfeasor in committing the underlying tort." *In re TelexFree Secs. Litig*. ("*TelexFree II*"), 626 F. Supp. 3d 253, 269 (D. Mass. 2022) (Hillman, J.) (citing, *inter alia*, *Mass. Port Auth. v. Turo, Inc.*, 487 Mass. 235, 244 (2021)). Circle argues that Plaintiffs fail to plead Circle's actual knowledge and its substantial assistance to the tortfeasor. (Br. at 17-23.)

"[S]ubstantial assistance is not to be considered without considering the knowledge element." *In re Telexfree Secs. Litig.* ("*TelexFree I*"), 389 F. Supp. 3d 101, 107 (D. Mass 2019) (Hillman, J.). "[W]hen there is actual knowledge that acts will substantially assist the fraud, the bar for substantial assistance is lowered." *In re TelexFree Secs. Litig.* ("*TelexFree III*"), 2023 WL 4399986, at *3 (D. Mass. Jan. 3, 2023) (Hillman, J.). In Massachusetts, as in other jurisdictions, "allegations supporting a plausible inference that the defendant knowingly enabled a perpetrator to carry out a . . . scheme suffice to establish substantial assistance at the pleading stage." *In re Aliera Cos., Inc.*, 2025 WL 2599852, at *37 (Bankr. N.D. Ga. Sept. 8, 2025) (citing *TelexFree II*, 626 F. Supp. 3d at 273 and collecting authorities).

"To the extent shared intent is a required element of tortious aiding and abetting under Massachusetts law," it is satisfied by "allegations supporting an inference that [defendant] furthered the [] scheme despite knowledge of its fraudulent nature[.]" *TelexFree II*, 626 F Supp.

3d at 274 (citations omitted). "Generally, this prong is met when the other prongs are met." *TelexFree III*, 2023 WL 4399986, at *3 (citing *Turo*, 487 Mass. at 246 n.4); *see also id.* (intent met if defendant "knew services *in this instance* would assist the fraud" (emphasis original)).

Here, Plaintiffs' allegations show that Circle knew about the Drift exploit, and also that Circle knowingly and substantially assisted it. Thus, Massachusetts' "actual knowledge," "substantial assistance," and "shared intent" requirements are met.

**1. Plaintiffs Plausibly Allege Circle's "Actual Knowledge"**

Circle contends that Plaintiffs' allegations "do not remotely establish" its actual knowledge of the Drift exploit. (Br. at 22.) But Plaintiffs need only allege general knowledge at this stage, and numerous allegations give rise to an inference that Circle knew of the Attackers' conversion. *See TelexFree II*, 626 F. Supp. 3d at 272.

First, Plaintiffs allege that Circle gained actual knowledge of the exploit through its direct communications[3] with Drift and other involved parties shortly after the Attackers started their getaway. (AC ¶¶ 55–57.) This allegation is supported by: (1) Drift's post on X, stating that it was "coordinating with multiple security firms, bridges, and exchanges to contain the incident" (*id.* ¶ 56); and (2) prompt, successful efforts by other bridges and exchanges—including Circle's competitors—to help thwart the Attackers' scheme by withholding assistance (*id.* ¶¶ 54, 62).

Second, Plaintiffs allege facts raising a strong inference of Circle's actual knowledge through profuse, real-time posts and discussions of the Drift exploit on X, the main media platform for crypto. (*Id.* ¶¶ 52–57.) Such "circumstantial evidence . . . support[s] a finding of actual knowledge." *TelexFree II*, 626 F. Supp. 3d at 272 (quoting *Silvercreek Mgmt., Inc. v.*

[3] Defendants' Rule 26(a)(1) initial disclosures acknowledge they possess "communications from representatives of the Drift Protocol regarding the alleged exploit of the Drift Protocol," along with their own communications to Drift's representatives.

*Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018)). For example, Plaintiffs allege that Drift publicly announced to its 135,000 followers that "it observed unusual activity on its protocol," then confirmed "an active attack" and its suspension of deposits and withdrawals. (AC ¶¶ 55, 56.) Plaintiffs also allege "countless mentions of the exploit" "flooded" X, including an early alert from a major crypto investor and influencer with over 447,000 followers: "hello someone from circle reach out asap, seeing . . . a potentially large exploit." (*Id.* ¶¶ 52-54.)

Circle dismisses these as "unverified tweets" (Br. at 22), despite the fact that two of them were from Drift itself, with one confirming the exploit (AC ¶¶ 55-56). Moreover, Circle cites no authority holding that only "verified" reports give rise to knowledge. Accordingly, these facts plausibly support that "Circle learned of the exploit and the Attackers' use of USDC to offload the funds" "[t]hrough continuing updates and discussion on X." (*Id.* ¶ 57); *see also Patriot Grp., LLC v. Edmands*, 96 Mass. App. Ct. 478, 489 (2019) ("The complaint sufficiently alleges" defendant "knew about the defamatory online posts.").

Lastly, other allegations bolster the inference that Circle knew of the exploit and its own role in it. One is the eight-hour duration of the bridging process[4] during U.S. business hours—over half of which elapsed *after* Drift's announcement. (*See* AC ¶¶ 4, 55, 56, 60.) Another is the scale of the heist (nearly $300 million) and the anomaly of brand-new crypto wallets' sending and receiving "multimillion-dollar transmissions in rapid succession" through the CCTP. (*Id.* ¶¶ 2, 3, 47, 58.) Further, Circle "conduct[s] blockchain and transaction monitoring" using "AI

---

[4] Circle is incorrect that Plaintiffs do not allege when during the eight-hour getaway the CCTP services were provided. (Br. at 14.) Plaintiffs allege that Drift was compromised "at approximately 11:15 a.m." EDT. (AC ¶ 51.) The Attackers "drained more than $285 million" in crypto "[w]ithin minutes," "quickly swapped" those assets for USDC, and "then began transferring the USDC across blockchain networks" using CCTP. (*Id.* ¶¶ 46-48.) This sufficiently supports an inference that the CCTP bridging process made up nearly all of the eight-hour getaway period. Plaintiffs' subsequent investigations confirm that.

and advanced tools to stay ahead of financial crime." (*Id.* ¶ 59.) Not least, Circle's CEO did not deny it knew of the exploit as it unfolded when commenting on its April 1st actions. (*Id.* ¶ 64.) Instead, he "defended Circle's decision" to continue providing Attackers its technology and services, consistent with its policies. (*Id.*) And Circle continues to defend its decision. (Br. at 26.)

Taken together, Plaintiffs' allegations support Circle's knowledge of the Drift exploit.

**2. Plaintiffs Adequately Allege Circle's Substantial Assistance.**

Plaintiffs allege that Circle substantially assisted the Attackers when it knowingly provided "technology and services" (AC ¶¶ 6, 63) necessary to "transmute the entire value of the converted crypto into assets not subject to seizure" (*id.* ¶ 101). This allowed the Attackers "to abscond successfully with these assets," which they "could not have done" "without the assistance." (*Id.* ¶ 103; *see id* ¶ 101.)

Circle argues that Plaintiffs allege "mere inaction" or "routine banking services" that cannot arise to "the level of substantial assistance" absent a fiduciary duty. (Br. at 18-22.) But Plaintiffs do not allege just inaction; they allege bridging was an active process in which Circle created new tokens on a different blockchain for the Attackers. What's more, "inaction" or "routine" transactions constitute substantial assistance where, like here, defendants knew they were enabling the scheme. *See Wood v. Bank of Am., N.A.*, 2025 WL 894650, at *8 (D. Mass. Mar. 24, 2025) (Casper, J.); *see also Mansor v. JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 266 (D. Mass. 2016) (Dein, M.J.).

**a. Plaintiffs Allege More Than "Mere Inaction" or "Routine" Services.**

Plaintiffs allege more than inaction by Defendants. (Br. at 18.) They detail how Defendants "substantially assisted the Attackers in converting Plaintiffs' crypto assets by bridging [USDC] from the Solana blockchain to the Ethereum blockchain." (AC ¶ 103.) Through

its CCTP, Circle "burn[ed]" each Solana-based USDC token and "mint[ed]" a new Ethereum-based USDC token in its place—both subject to Circle's control. (*Id.* ¶¶ 31, 33.) This required "an affirmative, centralized attestation" from Circle "before the newly minted USDC [could] be released onto" the Ethereum chain—or else the transfer would fail. (*Id.* ¶ 32.) In all, Circle minted over 230 million USDC for the Attackers, in over 100 separate transactions, for more than eight hours. (*Id.* ¶ 48.) These allegations amount to affirmative acts—and *not* inaction.

Circle's attempts to refashion its conduct as passivity fail. On a motion to dismiss, the Court accepts Plaintiffs' allegations as true and draws "all reasonable inferences from the facts pled in favor of the Plaintiffs." *In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 338 (D. Mass. 2002) (Young, C.J.). Here, it is reasonable to infer that Circle gave *active* assistance from allegations that its CCTP destroyed then minted cryptocurrency for the Attackers in more than 100 transactions that would have failed without Circle's authentication. (AC ¶¶ 31, 32, 103.)

Circle cannot discredit those well-pleaded allegations with language from its own website about the CCTP's technical mechanics. (Br. at 11-12.) Not only does Circle provide no basis for the Court to accept those statements for the truth of the matter, but those statements impermissibly fall outside the pleadings, even if they are drawn from a website cited therein. *See Prime Hookah, Inc. v. M.K. Distribs., Inc.*, 2020 WL 3977381, at *4 n.8 (D. Mass. July 14, 2020) (Saylor, C.J.) ("A complaint cannot incorporate the contents of a website by reference simply by mentioning the website's existence." (citation omitted)). And *nowhere* do Plaintiffs allege the CCTP transfers at issue involved any third-party integration or "non-Circle" products—improper assertions with no basis. (Br. at 11-12, 20.) In any event, even if Circle built its CCTP as "permissionless," that does not alter the nature of the acts performed—Circle actively transferred tokens across blockchains by burning, authenticating, and minting them.

### b. Routine Banking Services or "Inaction" Qualify as Substantial Assistance.

Even if Circle's cross-chain transfers on April 1st are properly characterized as "routine banking services" or "inaction," Defendants are incorrect that these acts are only actionable if a fiduciary duty is owed. (*See* Br. at 18-19.) It is well settled in this District that "where a bank has actual knowledge that its services are facilitating" a tort, "those services can constitute substantial assistance." *TelexFree II*, 626 F. Supp. 3d at 273-74; *accord Mansor*, 183 F. Supp. 3d at 269 ("[E]ven ordinary business transactions a bank performs for a customer can satisfy the substantial assistance element . . . if the bank actually knew those transactions were assisting the customer in committing a specific tort." (quotation omitted)); *see also TelexFree III*, 2023 WL 4399986, at *3 (same) (quoting *Mansor*, 183 F. Supp. 3d at 269). As Defendants themselves acknowledge, "routine bank services" suffice where it is plausibly alleged that the bank "has actual knowledge that its routine services are assisting a customer in committing a specific tort." (Br. at 20-21 (quoting *Wood*, 2025 WL 894650, at *8)); *see also Mansor*, 183 F. Supp. 3d at 266 ("inaction" can be substantial assistance where allegations "link[] . . . alleged failure[s] . . . with an intent by the [defendant] to assist" the tort).

In *TelexFree II*,[5] this Court upheld an aiding and abetting claim based on allegations

---

[5] This Court's multiple aiding-and-abetting rulings from the recent *In re TelexFree* multidistrict litigation offer the most analogous, and persuasive, analyses from this District. In at least three decisions, the *TelexFree* court considered and applied the same authorities cited by Defendants to similar facts. *See TelexFree I*, 389 F. Supp. 3d at 106-07 (citing *In re State Street Cases*, 2013 WL 5508151 (D. Mass. Aug. 21, 2013) (Boal, M.J.), *report and recommendation adopted in part, rejected in part*, 2013 WL 5508349 (D. Mass. Sept. 27, 2013); *Arcidi v. Nat'l Ass'n of Gov't Employees, Inc*., 447 Mass. 616 (2006); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79 (D. Mass. 2002) (Saris, J.)); *TelexFree II*, 626 F. Supp. 3d at 269-91 (citing *Turo*, 487 Mass. 235; *Go-Best Assets Ltd. v. Citizens Bank of Mass*., 463 Mass. 50 (2012); *Taylor v. Am. Chem. Council*, 576 F.3d 16 (1st Cir. 2009); *Mansor*, 183 F. Supp. 3d 250; *Lerner v. Fleet Bank, N.A*., 459 F.3d 273 (2d Cir. 2006); *Cahaly v. Benister Prop. Exch. Trust. Co., Inc.*, 451 Mass. 343 (2008); *In re State Street Cases*, 2013 WL 5508151; *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467 (1994)); *TelexFree III*, 2023 WL 4399986, at *3 (citing *Mansor*, 183 F. Supp. 3d 250; *Turo*, 487 Mass. 235).

similar to Plaintiffs'—that a bank "facilitat[ed] [] a $30 million transfer" that "substantially aided" fraudsters "in absconding with victim funds." 626 F. Supp. 3d at 273. This amounted to "substantial assistance" because the plaintiffs plausibly alleged the bank knew that the transferee "was operating a fraudulent pyramid scheme," that the transferor "was processing payments for the fraudulent scheme," and "that the transfer . . . would further the scheme." *Id.* The court also held that authorizing account transfers or processing payments could be substantial assistance, "[g]iven the inference of actual knowledge" that it would aid tortfeasors. *See id.* at 276, 279. The *TelexFree II* decision reflects the common law rule across U.S. jurisdictions. *See In re Aliera*, 2025 WL 2599852, at *37 (NY, FL, CA, OR, MI, VA, NV, and WA follow *TelexFree II*'s rule).

Here, Plaintiffs' allegations show that Circle knew its services would substantially support the Attackers' conversion of the assets. Plaintiffs allege that Drift announced its "coordinati[on] with multiple security firms, bridges, and exchanges to contain the incident" (AC ¶ 56), and that Drift directly contacted Circle to that end (*id.* ¶ 57). Multiple bridges and exchanges disabled their platforms promptly upon learning of the heist, as not to further the Attackers' scheme. (*Id.* ¶¶ 54, 62.) Circle, in contrast, knowingly "continued to provide the Attackers the means to transmute the entire value of the converted crypto into assets not subject to seizure." (*Id.* ¶ 101.)

This assistance was not just substantial; Circle's minting of over $230 million in USDC on Ethereum was critical to the scheme's success. (*Id.* ¶ 103 ("The Attackers required the cooperation of Circle to abscond successfully with these assets and could not have done so without [it].").) Moreover, Circle understood the consequences of its involvement—*i.e.*, that the assets would be unrecoverable—since its technology had recently facilitated conversion of $188 million across 14 separate incidents. (*Id.* ¶¶ 37 n.5, 38.) Circle's pattern of assisting thieves

caused one respected commentator to declare it a "bad actor" months before Drift was raided. (*Id.* ¶ 38.) And since the exploit, Circle has claimed neither ignorance nor impotence, but instead expressed defiance at the suggestion that it should have acted differently. (*Id.* ¶ 64.)

None of Circle's authorities require a departure from *TelexFree II*. This case is factually contrary to *Ferrante v. Santander Bank, N.A.*, 680 F. Supp. 3d 52 (D. Mass. 2023) (Gorton, J.), where the assistive "inaction" was the bank's partial failure to stop a wire transaction that the *plaintiff himself* authorized and twice confirmed as non-fraudulent before the bank sent the funds. *Id.* at 56-57. From those facts, the court could not find—and the plaintiff did not plead—the knowing assistance required to apply the inaction exception, discussed *supra*, in the case law. *Id.* at 59 (citing *Mansor*, 183 F. Supp. 3d at 266). Also distinguishable is *Go-Best*, 463 Mass. 50, where the plaintiff alleged true inaction (a bank employee's failure to inform its board of directors about dishonored checks) but not actual knowledge. *Id.* at 54-55 ("Go-Best contends that Citizens Bank *should have recognized*" (emphasis added)); *see also In re State St. Cases*, 2013 WL 5508151, at *23 ("State Street should have known"). In *Wood*, Judge Casper found that Bank of America lacked "actual knowledge that its routine services [were] assisting a customer in committing a specific tort" only because the plaintiff failed to allege actual knowledge. 2025 WL 894650, at *8 (quoting *TelexFree II*, 626 F. Supp. 3d at 272). And the bank's assistance alleged in *Hollis v. JPMorgan Chase Bank, N.A.* was truly *de minimus*—"remote deposit and remote wiring capabilities" that simply made ordinary banking easier. 2014 WL 12792255, *8 (D. Mass. Dec. 10, 2014) (Dein, M.J.). While the *Hollis* plaintiffs did "not allege facts showing how" those services were "a 'substantial factor' in causing their harm," *id.*, Plaintiffs here allege the Attackers "could not have" "abscond[ed] successfully" but for Circle's services (AC ¶ 103).

Circle's factual arguments are likewise unavailing. Under the law of aiding and abetting,

Circle need not participate in the initial theft or all subsequent steps to be liable. *TelexFree III*, 2023 WL 4399986, at *2 (rejecting argument that bank cannot be liable where "absconding with funds" occurred after assistance). Its actions need only be "a substantial factor in the [tortfeasor's] ability to perpetrate" the tort. *Turo*, 487 Mass. at 244 (quotation omitted); *see also Thomas v. Harrington*, 909 F.3d 483, 491 (1st Cir. 2018) (requiring "defendant's knowledge of its substantial, supporting role" (quoting *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 168 (1990))). Plaintiffs also need not allege Circle's "custody" of the USDC—though the fact that the CCTP destroys and creates native tokens certainly suggests it. Further, the Court must reject Circle's counter-factual assertions: that it had no relationship with the hackers (they were USDC and CCTP users (AC ¶¶ 57, 60, 63)); that Circle played no role in "multiple exchanges of the stolen" tokens (Attackers traded in and out of USDC positions to use CCTP and buy Ether (*id.* ¶¶ 47, 49)); that funds are unrecoverable because of "third-party applications, like Tornado-Cash" (they are unrecoverable because they are now in Ether (*id.* ¶¶ 49, 50, 109)); and that the bridging may have involved third-party integration of CCTP into non-Circle products (alleged nowhere).

In sum, because the "Attackers required the cooperation of Circle to abscond successfully" with Plaintiffs' "assets and could not have done so without that assistance" the substantial assistance prong is met. (*Id.* ¶ 103.)

### 3. Circle's Knowledge and Substantial Assistance Establish Intent.

"To the extent shared intent is a required element," Plaintiffs' allegations also meet that requirement. *TelexFree II*, 626 F. Supp. 3d at 274 (citing *Turo*, 487 Mass. at 246 n.4; *Planned Parenthood*, 417 Mass. at 481). Although Circle argues that this requires it to have shared the "goal of stealing the tokens" (Br. at 26), that is not the standard. Plaintiffs need only allege facts supporting "defendant's knowledge of its substantial, supporting role" aiding the wrongdoers.

*Thomas*, 909 F.3d at 491 (citing *Kyte*, 408 Mass. at 168); *see also Turo*, 487 Mass. at 244 (defendant liable if it "knowingly . . . provided an avenue . . . to its users to commit the" tort). "Generally, this prong is met when the other prongs are met." *TelexFree III*, 2023 WL 4399986, *3 (citing *Turo*, 487 Mass. at 246 n.4).

Disclaiming intent, Circle likens itself to an "innocent bystander[]" simply "watch[ing] a robbery without calling the police." (Br. at 18.) But Plaintiffs allege that Circle provided crucial services to the North Korean scheme for many hours, with the knowledge they were moving stolen funds. *See* Part III.C.2, *supra*. Those same allegations establish shared intent. *See TelexFree III*, 2023 WL 4399986, *3 (bank "knew services *in this instance* would assist the fraud, so the intent prong is met" (emphasis in original)); *accord TelexFree II*, 626 F. Supp. 3d at 274 (citing *Mansor*, 183 F. Supp. 3d at 273 (repeated assistance, coupled with actual knowledge, suffices)).

To the extent Circle argues the Supreme Judicial Court would impose a higher showing based on its reading of *Planned Parenthood*, the High Court has since declined to do so. As this Court recently observed in *TelexFree III*, the *Turo* Court (2021) considered its earlier precedents (*Go-Best* (2014) and *Planned Parenthood* (1994)) when it held—with no additional analysis—that intent was met "with knowledge and substantial assistance." *See TelexFree III*, 2023 WL 4399986, at *3 (citing *Turo*, 487 Mass. at 246 n.4). *Turo*'s holding accords with the Supreme Judicial Court's even earlier holding in *Kyte* (1990) that culpability under a "substantial assistance theory" requires "defendant's knowledge of its substantial, supporting role" in the scheme. *Kyte*, 408 Mass. at 168. To the *Kyte* Court, this simply meant knowledge that a *specific* convenience store was unlawfully selling cigarettes to minors—and not just that *some* convenience stores were doing so. *Id.* And that conception of culpability aligns with those applied in the

*TelexFree* and *Mansor* decisions. *See, e.g.*, *TelexFree II*, 626 F. Supp. 3d at 274 (bank "furthered the [] scheme despite knowledge of its fraudulent nature"). These decisions, and not *Hollis*, 2014 WL 12792255, represent this Court's most recent analyses after *Turo* superseded *Planned Parenthood*. *See also*, *e.g.*, *Wood*, 2025 WL 894650, at *7-8 (citing *Turo* elements, without intent); *Carr v. Town of Bourne*, 2023 WL 2918922, at *3 (D. Mass. Apr. 12, 2023) (Cabell, M.J.) (same); *Barnia v. Kaur*, 2024 WL 914780, at *8 (D. Mass. Feb. 1, 2024) (Joun, J.) (same).

**D. Plaintiffs Have Pleaded a Viable Negligence Claim.**

Circle's challenges to Plaintiffs' negligence claim also lack merit. Circle's knowledge of Attackers' misappropriation of Plaintiffs' assets gave rise to a tort duty to prevent foreseeable harms from its actions—and bars application of the economic loss rule.

Circle's duty arguments start on the wrong supposition—that the duty would be one to "monitor" or "investigate," based on the "fact that a bank account can be used in the course of perpetrating a fraud[.]" (Br. at 24 (quotations omitted).) This is not what Plaintiffs claim. Instead, they allege that Circle had a duty to not render services and technology to users when it knew they *were being used* to perpetrate a conversion of Plaintiffs' property. (AC ¶¶ 105-10.)

"The existence of a duty" is a question to be "determined by reference to existing social values and customs and appropriate social policy." *Wofse v. Horn*, 523 F. Supp. 3d 122, 137 (D. Mass. 2021) (Young, J.) (quoting *Williams v. Steward Health Care Sys., LLC*, 480 Mass. 286, 290 (2018)). "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Id.* (citing *Jupin v. Kask*, 447 Mass. 141, 146 (2006)). "To the extent that a legal standard does exist for determining the existence of a tort duty . . . , it is a test of the 'reasonable foreseeability' of the harm." *Brown v. United States*, 557 F.3d 1, 4 (1st Cir. 2009) (quoting *Jupin*, 447 Mass. at 147).

"More specifically, where an actor is able to foresee that his conduct could cause harm to others, he is charged with a duty to exercise reasonable care to avoid this harm." *Id.*

This Court has recognized that a bank has a duty to non-customers to stop misappropriation of their funds under the circumstances Plaintiffs allege—that Circle "has actual knowledge of an intended or apparent misappropriation of funds and its failure to act would constitute participation or acquiescence in the misappropriation." *Romano v. Computershare, Inc.*, 2019 WL 13219376, at *4 (D. Mass. Mar. 13, 2019) (Mastroianni, J.) (quoting *Go-Best*, 463 Mass. at 54). In *Romano*, the plaintiff alleged that a brokerage firm acted negligently when it "provided medallion signature guarantees" on forged, fraudulently transferred stock certificates. *Id.* at *2, *4. Even though he was not a customer, the court found that the plaintiff was owed a duty because "it is foreseeable an investor would be harmed by a financial institution guaranteeing forged signatures." *Id.* at *7.

Here, Plaintiffs' allegations give rise to a similar duty. Circle knew the Attackers had stolen Plaintiffs property and were using Circle's USDC and CCTP to unload it. (AC ¶ 106.) It was reasonably foreseeable to Circle that providing bridging services to thieves and failing to freeze the USDC would cause harm to Plaintiffs. (*Id.* ¶ 107.) Moreover, "Circle was in a unique position to prevent the harm suffered by Plaintiffs" and has stated its aim to "exceed the expectations of those who depend on us" to prevent internet crime. (*Id.* ¶¶ 107-08.) Like *Romano*, "[t]his is a scenario where 'reasonable persons would recognize [a duty] and agree it exists." 2019 WL 13219376, at *7 (quoting *Jupin*, 447 Mass. at 146).

Further, the economic loss rule does not categorically bar negligence claims, as Circle suggests, not involving damage to person or property. (Br. at 26.) Plaintiffs' claim survives because it falls within exceptions recognized in this District and by Massachusetts courts.

In *Portier v. NEO Technology Solutions*, this Court looked to Pennsylvania's economic loss doctrine, which "mirrors the rule in Massachusetts," to determine whether negligence claims arising from a data breach should be barred. 2019 WL 7946103, at *19 (D. Mass. Dec. 31, 2019) (Robertson, M.J.) (collecting authorities), *report and recommendation adopted*, 2020 WL 877035 (D. Mass. Jan. 30, 2020) (Hillman, J.). The court reasoned that the Supreme Judicial Court would *not* bar recovery because the "source of Defendants' duty" was "the common law," not a "negotiated agreement." *Id.* at *20-21 (discussing *Dittman v. UPMC*, 649 Pa. 496 (2018)).

While, unlike here, the parties in *Portier* were employees and employer, that was just one ground for the result. *Id.* at *21. Specifically, the *Portier* court approved *Dittman*'s reasoning that where "defendant undertook . . . affirmative acts" that created a "scope of risk" of harm to plaintiffs, that harm is foreseeable, and damages are awardable. *Id.* at *20. The court held that a "special relationship" exists where "a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.'" *Id.* at *21 (quoting *Adams v. Cong. Auto Ins. Agency, Inc.*, 90 Mass. App. Ct. 761, 765 (2016)). This is especially so where, like here, a defendant creates a risk of harm that plaintiffs are "powerless" to stop because of an "imbalance of power between the parties." *Id.* (citing *Clark v. Rowe*, 428 Mass. 339, 342 (1998)); *see also Shedd v. Sturdy Mem'l Hosp., Inc.*, 2022 WL 1102524, at *8 (Mass. Super. Apr. 5, 2022) (adopting *Portier*'s reasoning).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have sufficiently pleaded claims both for aiding and abetting conversion and for negligence, and Circle's motion should be denied. In the alternative, should the Court grant Circle's motion in whole or in part, Plaintiffs respectfully request leave to amend their pleading.

Dated: July 6, 2026

Respectfully submitted,

*/s/ John Roddy*

John Roddy (BBO #424240)
**BAILEY & GLASSER LLP**
101 Arch Street, 8th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
jroddy@baileyglasser.com

Rosemary M. Rivas (admitted *pro hac vice*)
Parker Hutchinson (admitted *pro hac vice*)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
pnh@classlawgroup.com

*Counsel for Plaintiffs Joshua McCollum, Oakford Crawson LLC, Jeffrey Magoveny, Ng Boon Min, Lim Teck Yeow, Alexej Kravetsker, and Michael Medovoj*